**SIGNED.**

**Dated: November 19, 2007**

**JAMES M. MARLAR**
**U.S. Bankruptcy Judge**

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | No. 4:06-bk-00515-JMM |
| CARDSYSTEMS SOLUTIONS, INC., | ) | |
| | ) | **MEMORANDUM DECISION RE:** |
| | ) | |
| Debtor. | ) | **CONFIRMATION OF LIQUIDATION PLAN** |

A confirmation hearing on the Debtor's liquidation chapter 11 plan came on for hearing on the 18th and 19th of October, 2007, and the 19th of November, 2007. The parties were present, and their appearances were noted on the record and transcripts. After consideration of the evidence, the entire administrative file in this case, the law, and the arguments of counsel, the court now issues its ruling, containing its reasons and conclusions.[1]

## BACKGROUND

### A. The Pre-Petition Debtor

The Debtor, CardSystems Solutions, Inc. ("Debtor" or "CardSystems"), while it operated, processed credit card transactions for financial systems such as Visa, MasterCard, American Express, and Discover. Its sponsoring bank was Merrick Bank Corporation ("Merrick").

---

[1] An attempted modification to the plan, filed November 14 and 16, 2007, was disallowed as untimely and for other reasons reflected by a separate order.

Sometime in May, 2005, a security breach occurred within the Debtor's secure financial network, when "unencrypted material was put on its server", which caused its entire network of credit card transactions to seize up. Visa then led the way and terminated its contractual relationship with the Debtor in late October, 2005. This in turn began a quick and domino-like cataclysm to the Debtor's business, requiring it to sell its processing assets, and ending in its filing of this liquidating chapter 11.

The collapse of the Debtor's internal security, or the perception of such collapse among and through the various layers of those connected with settling the ultimate financial losses, led to CardSystems' inability to continue in business. In one form or another, those who were innocent parties in the ensuing fear of a financial-loss tidal wave became, on the one hand, creditors of the Debtor and, on the other hand, litigants against each other as to who should bear the ultimate loss. Demands and counter demands were made back and forth, between Merrick and the Debtor, between December, 2005, and May 2006 (Ex. 5A-5O), as Merrick was pressured to respond to Visa's and MasterCard's demands for indemnification. (See, e.g., Ex. 3A-3I.)

In order to attempt to salvage some value from its business, CardSystems sold its card-processing assets to a private company known as Solidus Networks, Inc ("Solidus") for $50.5 million. This sale was evidenced by $22 million in cash, $3.5 million in assumed liabilities, and $25 million in convertible promissory notes which now have been converted into Solidus common stock. Of the cash, approximately $5.1 million was placed on deposit with Merrick, devoted to resolving Merrick's claims for losses, and $9.9 million in cash and stock was placed in another escrow account with JP Morgan ($6.4 million in cash and $3.5 million Solidus stock), also earmarked for resolution of Merrick's future claims. Within 90 days of the bankruptcy filing, Merrick drew out $1,216,195 from one of the deposits and applied it to its alleged debt.

The Debtor's equity structure included at least $40 million in stock outstanding to the Blair Companies, Kipharts, and Camden Partner groups, which entities or individuals later redeemed or attempted to redeem their stock after the Debtor became insolvent and had no capital surplus.

Its back against the wall, and with no operating business, the Debtor elected bankruptcy relief.

**B. The Bankruptcy Case**

The Debtor filed its chapter 11 case on May 12, 2006. So far, the case has logged over 500 docket entries. Debtor's counsel has been awarded $512,157.36 in interim compensation for fees and costs. In addition, accountants for the Debtor have been granted interim compensation of fees and costs of $81,527.50, while Debtor's special counsel has received interim compensation of $8,599.40. All told, so far, professionals working for the Debtor have realized $602,284.26, in interim compensation, all work for a non-operating, liquidating chapter 11 debtor-in-possession.

The theory behind the Code's scheme for allowing a debtor-in-possession to control its own liquidation is that management best understands the business and is in the optimum position to maximize its assets. *See In re Deer Park, Inc.*, 136 B.R. 815, 818 (9th Cir. BAP 1992), *aff'd*, 10 F.3d 1478 (9th Cir. 1993) ("A liquidation under Chapter 11 allows the debtor in possession, one who is presumably more familiar with the assets of the debtor's organization and its respective values, the ability to plan for an orderly divestiture of the assets over time as opposed to a Chapter 7 trustee, who is generally less familiar with the debtor's assets."); *In re Guy F. Atkinson Co. of Cal.*, 242 B.R. 497, 502-03 (9th Cir. BAP 1999) ("The trustee and debtor in possession, as fiduciaries on behalf of the creditors of the estate . . . have the obligation and are in the best position to negotiate settlements that will best serve the interests of all the creditors.") Ultimately, however, the debtor must propose its liquidation plan to its creditors, and test both their votes and the viability of its plan against the harsh reality of good faith, feasibility, and the other necessary provisions of the reorganization chapter of the Bankruptcy Code. *Deer Park,* 136 B.R. at 818.

Having reduced its tangible assets to cash or Solidus stock before filing bankruptcy, the Debtor entered the bankruptcy court on May 12, 2006 with the following assets:

| | |
|---|---|
| Cash in various accounts | $2,482,553 |
| Receivables | $274,000 |
| Solidus stock | Unknown value |
| Escrow accounts | $10,313,761 |

(Schedules, Dkt. #6.) The escrow accounts were established in order for the Debtor to provide a convenient mechanism to resolve disputes with, and repay Merrick for that creditor's estimated future potential losses. Funds from the sale to Solidus were set aside for such purpose, as a condition for Merrick's agreement to allow the Debtor to sell off its card-processing assets. (*See* Schedules, Dkt. #6.) Merrick has filed claims in the bankruptcy case for approximately $14.7 million. (Ex. 4.)

In its schedules, the Debtor's CEO, Edward B. Berger, listed the Debtor as having no secured creditors. Total scheduled unsecured liabilities, while including numerous creditors with "unknown" debt obligations, totaled $23,464,113.55. (Schedules, Dkt. #6.)

Initially, the Debtor also filed a list of all of its equity security holders, which included the following entities or individuals:

| Name | Percentage of Stock Ownership |
|------|------------------------------|
| Camden Partners (various) | 34.73632% |
| Kipharts | 21.15432% |
| William Blair Companies (various) | 5.89660% |
| | 61.78724% |

(Dkt. #7.)

The Debtor's statement of affairs also listed, as it was required to do, all payments to creditors which were made within 90 days of the filing, including a $1,216,196 payment to Merrick, one of its scheduled unsecured creditors. It also listed a number of payments to other insiders, stockholders, and/or officers of the Debtor who or which had received substantial sums within the year prior to bankruptcy:

| | | | |
|------|------|------|------|
| Camden Partners | Shareholder | $ | 24,494.70 |
| Edward B. Berger | CEO | | 34,419.70 |
| John M. Perry | Former CEO | | 325,000.00 |
| Kenneth Maliga | Shareholder | | 485,589.69 |
| Linda Ford | General Counsel | | 26,548.63 |

4

| | | |
|---|---|---|
| Michael Love | Shareholder | <u>485,589.67</u> |
| <u>TOTAL</u> | | $1,381,642.39 |

(Dkt. #5, question #3.c.)

During the eighteen (18) months in which this case has been in chapter 11, the Debtor has proposed four different liquidating plans, but has abandoned the confirmation efforts for all but the current one. Those plans were filed on May 12, 2006 (Dkts. #13 and #14), October 3, 2006 (Dkts. #114 and #115), May 31, 2007 (Dkts. #330 and #331), and finally August 3, 2007 (Dkts. #377 and #378).

Besides proposing its various plans, the Debtor has chipped away at various claims that were filed by creditors (a flurry of such activity occurred between January and March, 2007), and filed a pre-plan motion to engage special counsel to pursue litigation on various insurance policies owned by the Debtor.

As for the claims objection activity, pursued when the Debtor had a diminishing pool of assets to distribute, such effort was premature and served a limited purpose, except perhaps for the Debtor's desire to narrow the field of eligible voting unsecured creditors. In this effort, the Debtor was able to obtain some concessions and a few Pyrrhic victories, but this activity also generated a major "pushback" from CardSystems' primary legal adversaries.

The Debtor's other significant case event (aside from its behind-the-scenes efforts to settle other claims, principally with Merrick) was its attempt to create and implement what is styled as an "Insurance Trust." This motion was filed on March 19, 2007, but was without any detail as to exactly what facts or legal theories made up its claims. The motion sought the appointment of special counsel to pursue such causes of action. (Dkts. #262 and 264.) No attorney opinion letter was attached, nor was any outline of the causes of action attached or factually supported, nor was there any specificity as to how losses were alleged to be covered by such policies. In the end, the court denied the requested relief, expressing a desire that this strategy be included in a liquidation plan so that the creditor body could vote for or against this concept. (Dkt. #312.)

As the Debtor's case headed toward finality as to whether its plan could be confirmed, odd things began occurring with respect to the Debtor's shareholders. In November and December of 2006, the Debtor's shareholders began filing "Proofs of Interest" with the court, as notices required them to do. In

those documents, the shareholders consisting of Camden Partners, Kipharts, and the William Blair Companies, with the exception of Camden, noted that they had exercised their redemption rights. However, their "Proofs of Interest" did not claim that their status was to be elevated to that of unsecured creditors. (Dkts. #156, #157, #161-164, and #185-190.)

But, within a month of the commencement of the confirmation hearing, on September 18, 2007, the Debtor's CEO, Edward B. Berger, and the Debtor's attorneys, filed an amendment to the Debtor's schedules which now maintained that these equity holders were to be transported to the status of unsecured creditors, due to their "indemnification" and "redemption" rights. (Dkt. #440.) The Debtor went further, and in the same document, "deleted" the same parties from the list of equity holders:

| Name | Percentage of Stock |
|------|---------------------|
| Camden Partners (various) | 34.73632% |
| Kipharts | 21.15432% |
| William Blair Companies (various) | 5.89660% |
| | 61.78724% |

Then, to complete the circle, the Debtor included such equity holders as voting members of the "accepting" class 5 unsecured class. That change in both attitude and legal status, had other creditors not taken note and raised the issue, added over $40 million to the unsecured creditor voting pool, despite 11 U.S.C. § 1129(a)(10)'s admonition that insider votes must not be included in the count. In doing so, the claims of other true third-party creditors were intentionally diluted to a point where their votes against the Debtor's plan became legally insignificant. As the attorneys for Cumis Insurance Society, Inc. ("Cumis") aptly noted, this improper strategy "stuffed the ballot box."

Ultimately, at the confirmation proceedings, upon challenge, the court removed those equity votes from the equation, which then left the unsecured class (Class 5) without a sufficient dollar percentage to be counted as an accepting class. By removing "former" equity's votes, the group of creditors constituting Class 5 rejected, rather than accepted, the Debtor's plan.

At the confirmation hearing, Mr. Berger testified that he was surprised to have seen that equity group attempt to insert themselves into the proceedings as unsecured creditors. Yet, Mr. Berger had

6

signed the amendment to the schedules one month earlier which purported to change the equity holders' status (Dkt. #440). Then, through its attorneys, the Debtor pressed for acceptance of the Ballot Report, including those stockholder parties as Class 5 creditors, filing the Ballot Report the day the confirmation hearing began (Dkt. #495).

In May, 2007, one of the Debtor's major creditors, Cumis, filed a motion to appoint an independent trustee, pursuant to 11 U.S.C. § 1104. Cumis' principal concern was that the Debtor-in-Possession did not appear to be handling the case in an impartial manner (Dkts. #315 and 316). Cumis was disappointed that the Debtor had displayed a penchant for overlooking pursuit of preference and/or fraudulent conveyance actions under 11 U.S.C. §§ 547 and 548, by failing to attempt recovery of the $1.2 million paid to Merrick within 90 days of the bankruptcy case (disclosed in the schedules), and also failing to pursue all or some portion of the $1.4 million paid to the Debtor's insiders within one year of filing (also disclosed in the schedules). The Debtor, in Cumis' view, had shown little or lackluster interest in pressing such claims, and opined that it was therefore difficult for the Debtor to aggressively assert its fiduciary duties, and that it appeared to be distracted from the goals of liquidation by singling out Merrick and the shareholders for favored treatment. Cumis expressed concern that whatever estate remained was being squandered in unproductive uses. Cumis also objected to the Debtor's efforts to settle with Merrick on a lopsided favorable basis, believing that such strategy would not produce anything but further diminution of a dwindling estate, and that any settlement with Merrick would concede too much, at the expense of other creditors.

The Debtor, predictably, was indignant at such assertions, and eventually, Cumis withdrew the trustee request, without prejudice, in the hope that the confirmation hearing would better focus, and ultimately justify its concerns.

Thus, the stage was set for the confirmation hearing on the Debtor's Third Amended Chapter 11 Plan of Liquidation.

### C.  The Plan and Disclosure Statement

The Debtor's plan, as expressed both in writing and in the oral testimony, consists of three major components.  They are addressed below.

### Component 1.  The Merrick Settlement

The first major component of the Debtor's plan consists of a settlement of Merrick's claim:

a.      The plan proposes to settle Merrick's listed <u>unsecured</u> claim by treating it as a <u>secured</u> claim, giving it approximately $10 - $11.5  million in available escrowed or deposited cash;

b.      In return, the Debtor will receive, free of any claims of Merrick, a $3.5 million block of Solidus stock which is currently held in an escrow account.  However, Merrick still has decision-making power regarding the stock's sale, with a corresponding claim to some of the proceeds (if any) of that sale;

c.      The Debtor will also receive the accrued interest on the deposited and/or escrowed funds, from which it will pay $325,000 to settle the claims of another unsecured creditor group, the "Park/Schultz" parties;

d.      Merrick need never prove that it is entitled to the status of a secured creditor, and Merrick never has to defend its $1.2 million pre-petition payment as a voidable preference; and

e.      Merrick also benefits from a so-called "channeling injunction," wherein all claims against it by third-parties are relegated to claims against the Debtor's estate, only.  The channeling injunction relieves Merrick from the burden of defending itself in non-bankruptcy lawsuits against other non-debtor entities.  If the channeling injunction is approved, Merrick agrees to contribute approximately $1.5 million to the Debtor's estate.

8

**Component 2.  The Solidus Stock**

The second aspect of the plan involves the $25 million in the Debtor's stock in Solidus, a privately-held entity.[2]

Mr. Berger testified that the Debtor would hold the Solidus stock for eventual sale for the other creditors' benefit.  Even the date of sale (if the opportunity ever presented itself) was still subject to a committee vote, which committee included Merrick.  Upon sale, Merrick would receive another approximate $3.25 million to apply to its claim.

The Solidus stock, not being subject to an existing market, and containing sale restrictions, cannot be presently valued.  However, the Debtor speculates that it may have a value of $5 per share, the amount assigned to the shares when the Debtor acquired them.  But in examination, Mr. Berger, the current CEO of the Debtor, acknowledged that the stock's value could also be well below that number.  No market expert opined on the value of the Solidus stock, and no Solidus financial or balance sheet was placed in evidence, from which some conclusions might have been drawn about the equity's value.  Thus, the value of the Solidus stock is entirely speculative.  In other words, as attorney Lawrence Hecker testified, both the restrictions on the sale of the Solidus stock, together with the lack of a market for it, make it difficult to sell.  To add to the uncertainties about the Solidus, it has never paid shareholders a dividend, and its most-touted division, "Pay By Touch,"  is still raising equity capital for ongoing research and development of a new, technically untested product.

Mr. Berger's testimony crystallized the speculative nature of this stock.  When asked if he could put a value on it, he stated, "the stock could be worth a lot or a little someday."  Pressed further, Mr. Berger admitted that "there is no market value today," but that he had a "good hope that creditors will be paid based on the value of the stock."

In other words, the stock is, in all probability, worthless today, and there was nothing noteworthy presented to indicate that, in the future, such stock will ever be worth anything.

---

[2]	At the continued confirmation hearing held on November 19, 2007, the parties stated (and Mr. Watson testified) that an involuntary bankruptcy proceeding against Solidus had been filed on October 31, 2007, and that Solidus was experiencing conflict within its management ranks.

**Component 3.  The Insurance Trust**

The last major component of the Debtor's plan is the "Insurance Trust."

The Debtor's plan proposes to pursue its inspecific claims against its insurance carriers, and after deduction of a contingency fee to its attorneys (if successful), to distribute any collected funds to its creditors.

Other than Mr. Berger's view that this asset has value, which testimony lacked specificity as to facts or legal theories, no other testimony or evidence concerning the value of this asset was presented.

**DISCUSSION**

**1.  The Merrick Settlement**

The Debtor's plan proposes a compromise with Merrick.  Indeed, although that compromise constitutes the most significant part of the Debtor's plan, it too easily releases the bulk of the only real money to which the Debtor may lay a rightful claim.  Merrick was originally listed as a disputed unsecured creditor.  In the settlement with Merrick, which is part of the Debtor's plan, the Debtor now proposes to give to Merrick, on the plan's effective date, virtually all of the cash in the escrow or deposit accounts containing approximately $10 million, while the Debtor receives only the escrowed Solidus stock, and a relatively small interest kicker.

Also, the Merrick settlement, among other things, treats Merrick as a "secured" creditor, even though its interest in the escrow accounts at issue has never been litigated.  The court is unconvinced that this settlement is in the best interests of the estate.  No security agreement has ever been executed by the Debtor in Merrick's favor; nor has a security interest ever been granted to Merrick.  The escrow itself disclaims that Merrick has any ownership in the fund.  The Debtor must pay all taxes on any interest earnings and, once disputes are resolved, the Debtor has a reversionary interest in any amounts remaining in the account.  It would appear, on the surface, that the Debtor owns the escrowed funds.  (Ex. 4-F.)  To give up this valuable cash asset, then, in return for receiving only the valueless Solidus stock, and some accrued interest on the millions on deposit, is not in the best interests of creditors.  Despite Merrick's claim

1  to the contrary, the court is, on this record, unconvinced that Merrick either "owns" the escrowed monies,

2  or is a "secured creditor" with a perfected security interest therein. The court also does not believe that the

3  Debtor's estimate, of the degree of difficulty necessary to determine these discrete issues, is credible.

4      Both Merrick and the Debtor, pre-petition, merely devised a practical mechanism for the

5  resolution of future disputes, and set aside a pool of cash to accommodate that joint desire. That practical,

6  non-bankruptcy collection mechanism cannot survive, on this record, a challenge utilizing bankruptcy

7  statutes and case law. The fact remains, again on this record, that Merrick cannot prove itself to be a

8  secured creditor, nor, as it suggests, that the escrowed monies are not property of the estate. In other words,

9  it is premature to settle this issue. An independent bankruptcy trustee would be the best person to sort out

10  this problem, without the baggage of the Debtor's management's pessimistic and unsubstantiated views for

11  the Debtor's chances against Merrick.

12      As for the Debtor's insistence that its settlement with Merrick terminates state or federal court

13  litigation with Merrick, the court is admittedly baffled by such assertion. The Debtor has gained the benefit

14  of the automatic stay under § 362(a), so all pre-petition litigation against it is frozen in place. Merrick and

15  any other litigant can now file claims in the bankruptcy case, which, if assets are ever realized, can be paid

16  out pro rata as allowed, in the order of their true legal priorities. The ultimate amount of collected cash will

17  determine, as a practical matter, the extent of how much claims litigation is merited. Eventually, the

18  Debtor's estate will be exhausted and, to the extent other parties have rights against one another, they may

19  continue to assert them without any adverse impact on the Debtor's bankruptcy case. This aspect of the

20  settlement is simply not so important to this liquidating chapter 11 case that Merrick deserves to be richly

21  rewarded for its consent to a plan which treats it so favorably. And, in the context of a liquidation case,

22  settlement of Merrick's claim by giving away most of the Debtor's valuable assets is a luxury that this

23  Debtor and its creditors can ill afford.

24      Likewise, the plan's "channeling" or limiting injunction is inconsistent with third parties'

25  rights against one another. As an integral part of the Debtor's plan, it is prohibited by law in the absence

26  of express consent or lack of objection. *See* 11 U.S.C. § 524; *In re American Hardwoods*, 885 F.2d 621 (9th

27  Cir. 1989).

28

1    In conjunction with the plan, which incorporates the aforementioned settlement with Merrick,

2    the Debtor asks the court to apply the factors set forth in the Ninth Circuit cases of *In re Woodson*, 839 F.2d

3    610 (9th Cir. 1987) and *In re A & C Properties*, 784 F.2d 1377 (9th Cir. 1986). These factors must be

4    considered and weighed before a court can approve a settlement. Having done so, the court concludes that

5    the settlement is not in the best interests of the estate. A new eye needs to take a closer look at Merrick's

6    legal status before the bulk of the estate is given away through a final order which incorporates this

7    settlement.

8

9                              **2.  The Solidus Stock**

10

11    For all its sound and fury, the Debtor's claims that Solidus' stock is a valuable asset has little

12    to back it up. No credible evidence was presented that showed that such stock has any real value. Thus,

13    giving away virtually all of the Debtor's cash to Merrick, while retaining only that minimally valuable stock,

14    and some accrued interest, leaves the court wondering what type of investigation or due diligence has gone

15    into this aspect of the case, which is one of the three major pillars of the plan. The absolute lack of evidence

16    as to the stock's value, except Mr. Berger's hopeful view that it may have value someday, is inadequate to

17    support confirmation.

18    Mr. Berger's testimony as to the Solidus stock's value was conjectural at best, pure guesswork

19    at worst. Since there was no independent evidence to support the Debtor's rosy view of Solidus' value, this

20    leg of the Debtor's reorganization stool was completely sawn off in cross-examination.

21

22                              **3.  The Insurance Trust**

23

24    As for the insurance claims, there was likewise no evidence presented which actually

25    measured or discussed the theories, or the percentages associated with risk, or even what exactly made up

26    the claims. No attorney opinion supported the contentions. And, there was no dollar amount set forth as

27    to what would be realized for the estate even if the claims were successful in whole or in part, after

28    deduction of actual costs, fees, and considering the time value of money. Nor was the court informed as

1  to whether the policies carried contractual provisions for the estate's liability for the opposition's fees and

2  costs were the Debtor to lose the actions.

3          The best part of the Debtor's case on this point was that two extremely qualified attorneys,

4  Stanley G. Feldman and Gerald Maltz, were willing to accept engagement on a partial contingency fee basis.

5  But that was the totality of the evidence on this point. Just having good lawyers does not automatically

6  equate to dollars. Mr. Berger could not articulate the exact facts, policy provisions, or legal theories upon

7  which he based the Debtor's contention that these insurance claims had any value whatsoever.

8          Even the original motion, filed by the Debtor on March 19, 2007 (Dkts. #262 and 264)

9  contained no such pertinent information, and its only attachments consisted of the impressive résumés of

10  Messrs. Feldman and Maltz.

11          Ultimately, the Debtor had no dry powder to prime this aspect of its reorganization arsenal,

12  and the evidence regarding this important feature of the Debtor failed to generate a spark.

13          Both the insurance claims litigation, and the Solidus stock, are ephemeral assets at best. A

14  court may not confirm a speculative plan. *In re Pizza of Hawaii*, 761 F.2d 1374 (9th Cir.1985). Proposing

15  such a plan, after 18 months, has simply been a waste of time, and too little has been accomplished on this

16  record, at too great an expense.

17

18                              **LEGAL ANALYSIS FOR CONFIRMATION**

19

20          In order to confirm a contested plan, when all classes have not accepted the plan, a proponent

21  must prove all of the applicable and enumerated standards set forth in 11 U.S.C. § 1129(a) and the

22  "cramdown" provisions of § 1129(b). If a plan proponent cannot touch all the bases under § 1129(a), the

23  plan cannot be confirmed and there is no need to test the § 1129(b) factors. However, if the only condition

24  not satisfied is § 1129(a)(8), then a plan may still may be confirmed if the "cramdown" provisions of §

25  1129(b) are satisfied. *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997); *In re Arnold*

26  *and Baker Farms*, 177 B.R. 648, 658-59 (9th Cir. BAP 1994), *aff'd*, 85 F.3d 1415 (9th Cir. 1996); *In re M.*

27  *Long Arabians*, 103 B.R. 211, 217-18 (9th Cir. BAP 1989); 11 U.S.C. § 1129(a) (providing that "[t]he court

28  shall confirm a plan only if all of the following requirements are met."). Thus, if a plan proponent cannot

13

1   touch all sixteen bases under § 1129(a), the plan cannot be confirmed and there is no need to test the

2   § 1129(b) cramdown factors.

3          The court will now address each of the factors, and discuss whether the Debtor can confirm

4   its plan.

5

6                                    **Sections 1129(a)(1) and (2)**

7          **The Plan and Its Proponent Must Comply with the Bankruptcy Code**

8

9          These provisions are intended to ensure that the Debtor has adequately complied with the

10  Bankruptcy Code. In the instant case, the court must find that the Debtor's efforts have failed to clear this

11  hurdle. This is because the Debtor's last-minute efforts to tinker with creditors' and equity's true status

12  reflects poorly on a debtor-in-possession's duty to manage its case as a fiduciary. To first schedule $40

13  million as shareholder equity, and then to amend those schedules on the verge of voting in order to enlarge

14  those same persons' or entities' status to that of unsecured creditors calls into question whether the fiduciary

15  responsibilities required of a debtor's responsible officer, and legal resources of the debtor's attorneys were

16  being properly managed. To attempt to attain higher status for equity at the last minute, in order to

17  gerrymander the votes and attempt thereby to gain the overwhelming consent of the putative unsecured

18  class, is a violation of 11 U.S.C. § 1122(a).[3] Recharacterizing claims in order to "stuff the ballot box" is

19  unlawful, just as is the gerrymandering of similar claims into separate classes, without business or economic

20  justification, solely to create an accepting impaired class. *In re Barakat,* 99 F3d 1520, 1526 (9th Cir. 1996);

21  *In re Tucson Self-Storage, Inc.,* 166 B.R. 892, 898 (9th Cir. 1994); *see also 7 Collier on Bankruptcy* ¶

22  1122.03[2] (15th ed. rev. 2006) (claims and interests that are inherently different cannot be placed in the

23  same class). This attempt was doomed to failure, and pressing the point once objection was raised strained

24  the Debtor's credibility.

25

26

27  _____

28       [3]
           That section provides that a plan may place a claim or an interest in a particular class only
    if such claim or interest is substantially similar to the other claims or interests of such class.

Case 4:06-bk-00515-BMW    Doc 517    Filed 11/19/07    Entered 11/20/07 12:06:49    Desc
Main Document    Page 14 of 22

By failing to corral the equity holders into their proper niche and by Mr. Berger's protestation of surprise at their vote after he had signed the very amendment to the schedules which encouraged that vote, the Debtor violated § 1122's requirement that claims or interests be placed in substantially similar classes.                A bit more subtle was the Debtor's attempts, without any legal challenge, to simply capitulate, "reclassify," and elevate Merrick, by settlement, from its initial listing, as a disputed unsecured creditor, to the status of a secured creditor which was to be handed millions of dollars and a "channeling injunction" release from the claims of third parties. *See Ambanc La Mesa Ltd. P'ship,* 115 F.3d 650, 656-57 (9th Cir. 1997) ("separate classification for the purpose of securing an impaired consenting class under 1129(a)(10) is improper," and citing *In re Greystone III Joint Venture,* 995 F.2d 1274, 1279 (5th Cir. 1991)). The Ninth Circuit clarified that separate classification of "similar" claims "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." *In re Tucson Self-Storage, Inc.,* 166 B.R. 892, 897 (9th Cir. 1994); *Steelcase v. Johnston (In re Johnston),* 21 F.3rd 323 (9th Cir. 1994).

One such independent reason is where the creditors' claims have discrete business reasons for being classified in a different manner. *Steelcase, id.* Here, and as discussed above, Debtor's reasons why Merrick's claims are not similar to other unsecured claims and should not be classified accordingly were unpersuasive.

These tactics did not aid the Debtor in its effort to prove §§ 1129(a)(1) and (2). By misclassifying equity as debt, and facially unsecured debt as a secured obligation, the Debtor improperly attempted to skew the Code's classification requirements. In doing so, it failed to comply with two of the Code's requirements for confirmation.

In short, the Debtor failed to prove §§ 1129(a)(1) and (2).

### Section 1129(a)(3) - Good Faith

Even if, *arguendo,* the court's view of § 1129(1)(1) and (2) and its relation to § 1122, is erroneous, the same analysis applies equally to the Debtor's good faith, or lack thereof, under § 1129(a)(3) (providing that the bankruptcy court shall confirm a plan "if the plan has been proposed in good faith and

not by any means forbidden by law."). "The good faith that is required to confirm a plan requires the plan to achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Arnold and Baker Farms,* 177 B.R at 658; *see also In re Sylmar Plaza, L.P.*, 314 F.3d 1070 1074 (9th Cir. 2002). The good-faith determination is based on the totality of the circumstances. *Id.* Thus, the Debtor did not prove that § 1129(a)(3) was satisfied.

The Debtor has spent many hundreds of thousands of dollars to attempt to gain settlement of Merrick's questionable legal position. The Debtor is not required to continue to defend or prosecute any actions in any other court but this one, so its arguments that it is somehow benefitting the estate by settling other state or federal court lawsuits is meaningless. The Debtor is no longer operating, and it is pointless for it to even consider to continue to defend any pre-petition lawsuit at great cost to the estate. If any adverse party has a claim, litigation over that claim will most easily be measured by how much money there is to be shared between the creditors. This usually reduces controversies over claims to fairly summary proceedings in bankruptcy court. Litigants do not tend to squabble much when the money pond is close to dry.

In addition, as noted above, adding to the court's concern as to the Debtor's good faith, was the Debtor's Ballot Report which placed over $40 million in former equity claims in the unsecured creditors' category. These votes were by the same parties whom the Debtor had listed as equity holders in its schedules, which initially showed the Camden entities with 34.73% of the Debtor's stock, Kipharts with 21.5%, and the Blair Companies with 5.89%. The Debtor's last-ditch attempt to include "converted" or "redeemed" equity shares into unsecured creditors, and then to vote those shares in favor of the plan, was an act of bad faith and was utterly transparent. Moreover, the attempt was poor judgment on the part of the estate's fiduciaries.

The same holds true relative to the Merrick classification. Although Merrick's treatment could be tangentially justified as a compromise effort, this effort also smacked of prohibited gerrymandering. No court determination has ever been made as to Merrick's legal status, and the Debtor's decision to essentially give Merrick almost all of its cash, while retaining only Solidus' worthless stock and a bit of accrued interest, was not only a compromise that failed the *Woodson* and *A & C* tests, but doing so also gave the Debtor a much-needed impaired consenting class. As a result, Merrick is proposed to obtain

a better and undeserved treatment than other creditors of the same class, which violates 11 U.S.C. § 1122, and in turn, § 1129(a)(1), (2), and (3).

Finally, the channeling injunction, which attempted to nullify creditors' rights against non-debtor entities is impermissible, and another example of how the Debtor's plan fails to comply with applicable law.

In the crucible of a contested confirmation hearing, the Debtor has not carried its burden of proof regarding § 1129(a)(1), (2), and (3). So far as the record is concerned, it is not altogether clear that the Debtor will not take another run at letting Camden, Kipharts, and Blair Companies (and perhaps others) participate as unsecured creditors. After all, the Debtor amended its schedules exactly in this fashion. Shareholders are on the bottom rung, and may not be treated the same as unsecured creditors. *See* 11 U.S.C. § 510(b), (c). The risk that such parties took as shareholders is not commensurate with that taken by the unsecured creditors. *See, e.g., In re Pacific Express, Inc.,* 69 B.R. 112 (9th Cir. Bankr. 1986); *In re American Wagering, Inc.,* 493 F.3d 1067 (9th Cir. 2007) (shareholder subordination cases).

Thus, the court must find that the Debtor also failed to prove good faith under § 1129(a)(3).

**Section1129(a)(4) - Payments to Professionals and Others**

Section 1129(a)(4) requires that fees for those working on a debtor's case be submitted to the court, and approved as reasonable. The Debtor's plan so provides, and all fees approved to date have been allowed as interim, not final. Future requests will likewise be submitted to the court for approval. This section of the Code was satisfied.

**Section 1129(a)(5) - Future Officers of the Debtor**

The Code requires that those who are proposing to serve, post-confirmation, be disclosed and that their retention is in the best interests of creditors and equity security holders. The Debtor's plan and evidence satisfied the first prong, but not the second. Leaving Mr. Berger in control of any future ongoing liquidation at a cost of $10,000 per month or $300 per hour (up to $10,000) is an expense which is

17

unnecessary and far too expensive. Nor was this compensation scheme measured against alternative management methods. The court has no reason to doubt that, during Mr. Berger's long tenure at the helm of this crippled debtor entity, he has striven to do his best. But the choices made, for both action and inaction, and the great expense of this estate so far, with so little to show for it, lead the court to conclude that the creditor body would be better served by an independent person, unaffected by and unaffiliated with the ghosts of the Debtor's past. Thus, Mr. Berger's continued service, post-confirmation, is not in the estate's best interests, nor in the best interests of creditors.

Accordingly, the court finds that the Debtor failed to prove this required element under § 1129(a)(5).

**Section 1129(a)(6) - Regulatory Bodies**

The Code section, §1129(a)(6), is not applicable to this Debtor.

**Section 1129(a)(7) - Best Interests of Creditors**

Due to the Plan's attempt to prematurely surrender the vast bulk of the Debtor's treasury to Merrick, at the expense of the unsecured creditors, the court concludes that such creditors will not realize as much as they would on liquidation. An independent trustee should be given the opportunity for a fresh analysis. Thus, the Debtor has failed to convince the court that it has adequately complied with § 1129(a)(7).

**Section 1129(a)(8) - Acceptances or Unimpairment**

All impaired claims did not accept the Debtor's plan, thus requiring a "cramdown" approach to confirmation. 11 U.S.C. § 1129(a)(8) and (10); § 1129(b)(1). The Debtor proved, to the extent applicable in a "cramdown" case, compliance with § 1129(a)(8). However, since the case will not be in the legal posture to proceed to "cramdown," satisfaction of this element of § 1129(a) moots out.

### Section 1129(a)(10) - Acceptance by At Least One Impaired Consenting Class

This provision, requiring the consent of at least one impaired consenting class, has been satisfied.  § 1129(a)(10).

### Section 1129(a)(11) - Future Liquidation

Since the plan is a liquidation one, § 1129(a)(11) is not applicable.  The Debtor has satisfied this Code provision.

### Section 1129(a)(12) - Fees

The evidence was uncontroverted that all required court and U.S. Trustee's fees have been paid and are current.  Thus, § 1129(a)(12) has been satisfied.

### Section 1129(a)(13) - Retiree Benefits

This section of the Code, § 1129(a)(13), is not applicable.  It deals with retiree benefits, and this Debtor has no such group of former employees.

### Sections 1129(a)(14)-(16) - Domestic Support Obligations; Individual Chapter 11; Transfers

These provisions do not apply.

### The Plan Cannot Be Confirmed

As noted, the plan has numerous infirmities which make confirmation impossible.  This plan cannot be confirmed.

19

## CONVERSION TO CHAPTER 7

The Debtor has had 18 months within which to propose and confirm a plan of reorganization. For a liquidation case, this has been more than ample.

It is unlikely that the Debtor can now propose a better plan. Additionally, the estate is continuing to incur needless administrative expense in this effort. Further delay will clearly prejudice the creditors. It is now time for this vessel to sail on a different tack.

Therefore, on its own motion, in order to prevent a continuing loss to the estate, to lessen the ongoing risk of estate diminishment due to either a lack of focus or misguided judgment as to how and for whose benefit this case should proceed, and to avoid the passage of critical time periods, the court determines that this case is best served by being converted to a chapter 7 proceeding with the appointment of an independent trustee. The bankruptcy court has the power to do so. 11 U.S.C. § 105(a); 1112(b); 7 *Collier on Bankruptcy* ¶1112.04[9][b] at 1112-62 - 64.1 (15th ed. rev. 2006); *see also Marrama v. Citizens Bank of Mass.*, 127 S.Ct. 1105, 1111-12 (2007) (discussing the court's "broad authority" under § 105(a) to prevent an abuse of process); *In re Rubenstein*, 71 B.R. 777, 778-79 (9th Cir. BAP 1987) (stating that amended §105(a), when effective, would allow sua sponte conversion of a chapter 11 case to chapter 7). Importantly, when the U.S. Trustee appoints that individual, the trustee should be aware that the time within which to bring applicable avoidance actions has a short window before expiring. Whether this delay was inadvertent or intentional on the Debtor's part is unknown and immaterial. Nonetheless, it is a fact which requires immediate attention and perhaps action. A trustee should be appointed who has the time to undertake these important tasks, with a careful eye to 11 U.S.C. § 546.



**RULING**

Accordingly, the court will enter orders which will:

1.    Deny confirmation of the Debtor's Third Amended Chapter 11 Plan of Liquidation;

2.    Convert the chapter 11 case to one under chapter 7; and

3.    Direct the U.S. Trustee to appoint an independent chapter 7 trustee to oversee the future administration of this case.

DATED AND SIGNED ABOVE.

COPIES served as indicated below on the date signed above:

| | |
|---|---|
| Michael McGrath and Scott H. Gan<br>Mesch, Clark & Rothschild, P.C.<br>259 N. Meyer Ave.<br>Tucson, AZ 85701<br>Email ecfbk@mcrazlaw.com | Susan G. Boswell<br>Quarles & Brady LLP<br>One South Church Avenue, Suite 1700<br>Tucson, Arizona 85701-1621<br>Email sboswell@quarles.com |
| Nancy J. March<br>DeConcini McDonald Yetwin & Lacy, P.C.<br>2525 E. Broadway Blvd., #200<br>Tucson, AZ 85716-5300<br>Email nmarch@dmyl.com | Michael R. Davisson<br>Sedgwick, Detert, Moran & Arnold LLP<br>801 S. Figueroa St., 18th Fl<br>Los Angles, CA 90017-5556<br>Email michael.davisson@sdma.com |
| Scotty P. Krob<br>Law Office of Scotty P. Krob<br>8400 E. Prentice Ave. - Penthouse<br>Greenwood Village, CO 80111<br>Email spkrob@aol.com | Daniel G. Gurfein and Timothy T. Brock<br>Satterlee Stephens Burke & Burke LLP<br>230 Park Ave.<br>New York, NY 10169<br>Email dgurfein@ssbb.com<br>Email tbrock@ssbb.com |
| Richard J. Cuellar<br>Office of the U.S. Trustee<br>230 N. First Ave., #204<br>Phoenix, AZ 85003-1706<br>Email ric.j.cuellar@usdoj.gov | Scott D. Gibson<br>Gibson, Nakamura, & Decker, PLLC<br>2941 N. Swan Rd., Suite 101<br>Tucson, AZ 85712-2343<br>Email sgibson@gnglaw.com |

| | |
|---|---|
| Lynn Maynard Gollin<br>Tew Cardenas, LLP<br>Four Seasons Tower, 15th Floor<br>1441 Brickell Ave.<br>Miami, FL 33131-3401<br>Email lmg@tewlaw.com | Mark J. Bryn<br>Bryn & Associates<br>One Biscayne Tower, Suite 2680<br>Two S. Biscayne Blvd.<br>Miami, FL 33131<br>Email mark@markbryn.com |
| David B. Levant<br>Stoel Rives, LLP<br>600 University Street, Suite 3600<br>Seattle, WA 98101<br>Email dblevant@stoel.com | Michael E. Eidelman<br>Vedder, Price, Kaufman & Kammholz, P.C.<br>222 N. LaSalle Street, Suite 2600<br>Chicago, IL 60601-1003<br>Email meidelman@vedderprice.com |
| Mr. Jack Froonjian<br>Fiducial Processing Corporation<br>P.O. Box 1471<br>Wall, NJ 07719<br>Email jackf@bankersms.com | |

By /s/   M. B. Thompson
        Judicial Assistant

SIGNED